# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
### 5:05-CV-9-V

RACE CITY FASTENERS, INC.,     )
                                   )
     Plaintiff,               )
                                   )
     v.                    )     **MEMORANDUM and ORDER**
                                   )
SELECTIVE INS. CO. OF         )
SOUTH CAROLINA,            )
                                   )
     Defendant.           )
_____)

      **THIS MATTER** is before the Court on cross-motions for summary judgment as well as all of the memoranda and exhibits filed in support and / or in opposition thereto.  (Documents ##14, 15)  The Court also considers two (2) related motions filed by Defendant, a Motion to Strike Plaintiff's Reply, and Motion To Allow Supplemental Brief and Affidavit, both of which are opposed by Plaintiff.  (Documents ##22, 30)  For the reasons discussed herein, the Court finds that summary judgment in favor of Plaintiff is proper.

## I. FACTUAL AND PROCEDURAL HISTORY

      This suit concerns the liability of the Defendant insurance company for payment of $714,414.96 awarded to the Plaintiff via Default Judgment ("the underlying action") entered against a third party entity, Plasfab, by this court.  (*See* Civil Docket No. 5:03CV6)

      Plaintiff Race City Fasteners, Inc.'s ("Race City"), a North Carolina corporation, was formerly in the business of anodizing engine parts specially designed for Nascar racing.[1]  (*See*

---

[1] Race City maintains its corporation status but is no longer an operating business.

5:03CV06 / 8-19-03 Dflt. J. Hr'g at 5.)  Defendant Selective Insurance Company of South Carolina ("Selective") was the commercial insurance provider for Plasfab Incorporated ("Plasfab").  Plasfab, then a Rhode Island corporation, was in "the business of the design, development, fabrication and installation of manual and automated metal finishing systems." (5:03CV6 Compl., ¶¶2,4)  Relevant to the instant case, Race City purchased an anodizing line from Plasfab when it  undertook the anodizing of Nascar race engine pistons in-house.

In the underlying action, Race City sued Plasfab for breach of contract, breach of express warranty, breach of implied warranties, and negligence for installing an anodizing line[2] at Race City's facilities which allegedly did not work as promised. On February 24, 2003, after being served with the complaint in the underlying action, Plasfab informed its insurance company, Selective, of the lawsuit. On February 26, 2003, just two (2) days later, Selective declined coverage of the claim and, as a result, informed Plasfab that it would not be defending the suit. Plasfab filed no responsive pleadings. Thus, on April 14, 2003, default was entered. A hearing on damages was held on August 19, 2003, and a default judgment was subsequently entered against Plasfab in the amount of $714, 414.96.  (5:03CV6 Document #12)   However, no recovery was had by Race City, as Plasfab filed Chapter 7 bankruptcy in the U.S. Bankruptcy Court for the District of Rhode Island on February 27, 2004 (Case No. 1:04 BK 10603), and the case was closed on July 6, 2004, as a "no asset" case.

---

[2] According to testimony provided in the underlying action by Ron Anderson, consultant for Race City, "Anodizing is an electrochemical process by which we apply electricity to an acid bath and it deliberately rusts the aluminum, changing it from aluminum to aluminum oxide."  (8/19/03 Hr'g Tr. at 3.)  The Anodizing process was used by Race City to harden the area of the piston exposed to the most temperature and heat for engine combustion processes so that the aluminum of the piston does not stick to the ring.  (Hr'g Tr. at 4-5.)

Race City now alleges that Selective had a duty to defend in the underlying action because the complaint in that action alleged facts which brought Race City's claims at least potentially within the coverage area of the Selective policy. Race City further alleges that this breach of Selective's obligation results in Selective's liability for the entire amount of the default judgment in the underlying action. The Plaintiff also avers that it is a third-party beneficiary of the policy issued to Plasfab by Selective, or, in the alternative, an assignee of Plasfab.

The Defendant contends that there are no facts alleged in the underlying complaint that would bring Race City's claims within the coverage area of Selective's policy. Selective also cites several provisions within the policy which it contends exclude coverage for the claims brought by Race City.

## II. ANALYSIS

### 1. Summary Judgment Standard for Cross-Motions

Summary judgment is appropriate in those cases in which "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(c). In this case, the parties have filed cross-motions for summary judgment. Thus, this Court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law. Fed. R. Civ. P. 56(c). Rossignol v. Voorhaar, 316 F.3d 516 (4th Cir. 2003) (quoting Philip Morris, Inc. v. Harshbarger, 122 F.3d 58, 62, n. 4 (1st Cir. 1997)). When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing the motion. Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)).

Summary judgment is appropriate in a case like this as the question whether Selective had a duty to defend against Race City's claims is determined by interpreting the language of the policy and is a question of law which may be resolved by summary judgment. Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd., 7 F.3d 1047, 1050 (1st Cir. 1993); Anglo Am. Ins. Co., Ltd. v. Shooters at India Point, Inc., 959 F.Supp. 115, 116-17 (D.R.I. 1997).

**2. Choice of Law**

This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). In a diversity case, a district court will apply the conflict of laws rules of the forum state. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-497 (1941).   North Carolina law regarding insurance contracts states that "the principle of *lex loci contractus* mandates that the substantive law of the state where the last act to make a binding contract occurred, usually delivery of the policy, controls the interpretation of the contract." Fortune Ins. Co. v. Owens, 351 N.C. 424, 428 (2000); N.C. Farm Bureau Mut. Ins. Co. v. Holt, 154 N.C. App. 156, 163 (2002).   However,  N.C. Gen. Stat §58-3-1 creates an exception to the rule of *lex loci contractus* which provides that  "[a]ll contracts of insurance on property, lives, or interests in this State shall be deemed to be made therein . . . and are subject to the laws thereof." Construing N.C. Gen.Stat. §58-3-1, the North Carolina Supreme Court explained that this statutory exception applies only where a close connection exists between North Carolina and the interests insured by an insurance policy.  Owens, 351 N.C. at 428*; See also* Collins & Aikman Corp. v. Hartford Accident & Indem. Co., 335 N.C. 91, 95 (1993).

In the case at hand, the last act to make the insurance contract binding occurred in Rhode Island when Selective delivered the policy to Plasfab's agent, "Carey Richmond & Viking," at their

location in Rhode Island.  (Coventino Aff.;  Def.'s Exhs. A at S-2 and  B at S-54)   Although the

anodizing line purchased from Plasfab was installed at Race City's facility in Mooresville, North

Carolina, there are no other significant contacts between Plasfab and North Carolina.  Plasfab's

commercial operations were confined to the State of Rhode Island.   (Def.'s Exh. A at S-55; Exh D

at S-166; Exh. E at S-167)   Thus, the general rule of *lex loci contractus* controls and the law of

Rhode Island applies.[3]

## 3. Construction of Contracts

Under Rhode Island law, the terms of an insurance policy are interpreted according to the

same rules of construction as those governing contracts. <u>Town of Cumberland v. Rhode Island</u>

<u>Interlocal Risk Mgmt. Trust, Inc.</u>, 860 A.2d 1210, 1215 (R.I. 2004). The Court will look at the four

corners of a policy, viewing it in its entirety, affording its terms their plain, ordinary and usual

meaning.  <u>Town of Cumberland</u>, 860 A.2d at 1215.   Also, the Court will not deviate from the literal

policy language unless it deems the policy to be ambiguous. <u>Id.</u>  If, however, the Policy's terms are

ambiguous, or capable of more than one reasonable meaning, the Policy will be strictly construed

in favor of the insured and against Selective. <u>Id.</u>  Even so, the test to be applied in interpreting an

insurance policy is not what the insurer intended by his words, but what the ordinary reader and

purchaser would have understood them to mean. <u>Id.</u>

## 4. Selective's Duty to Defend Plasfab In The Underlying Action

An insurer's duty to defend is determined by the "pleadings test."  The "pleadings test"

requires the trial court to look at the allegations contained in the complaint, and "if the pleadings

---

[3] It appears there is no difference on any substantive point of law between North Carolina and Rhode Island law.  The Court also looks to North Carolina law for guidance.

recite facts bringing the injury complained of within the coverage of the insurance policy, the insurer must defend irrespective of the insured's ultimate liability to the plaintiff." Peerless Ins. Co. v. Viegas, 667 A.2d 785, 787 (R.I. 1995) (*citing* Employers' Fire Ins. Co. v. Beals, 103 R.I. 623, 632 (R.I. 1968)). "That duty, when blindly applied, may certainly result in the defense of 'groundless, false or fraudulent' suits, but the insurer is duty bound nonetheless." Peerless, 667 A.2d at 787 (*citing* Beals, at 631.) In other words, "if there is any chance that [the claim] even arguably [is covered]," the insurer has a duty to defend. *See* St. Paul Ins. Co. v. Vigilant Ins. Co., 919 F.2d 235, 240 (4th Cir.1990) (applying North Carolina law) (*emphasis in original*). Significantly, "[a]ny doubt as to coverage is to be resolved in favor of the insured." Bruce-Terminix Co. v. Zurich Ins. Co., 504 S.E.2d 574, 578, 130 N.C. App. 729 (1998).

In this case, the Policy begins with the following description of Selective's obligations:

> "We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . ."

(Policy, ¶I, A, 1a, at 1.) The Selective Policy provided Plasfab with contractual rights to both general commercial liability ("GCL") and indemnity coverage.[4] Like most insurers, in considering its duty to defend, Selective is required to make a decision at the outset of litigation regarding the potential for coverage based upon its reading of the pleadings and its own interpretation of the Policy.

---

[4] The duty to defend under a GCL policy is typically much broader than the insurer's obligation to indemnify. 46 C.J.S. Insurance §1145 (2007).

As explained in greater detail below, the GCL coverage was designed to protect Plasfab from claims of bodily injury or damage to property, as opposed to claims for repair or the replacement of defective products. Here, there is no claim of bodily injury. Plaintiff Race City avers instead that there was property damage covered by the Policy.[5]

The Court now addresses the parties' legal arguments regarding Selective's duty to defend.

**a) "Occurrence"**

Section I, Coverage A, Provision 1(b)(1) of the Policy states that "[t]his insurance applies to . . . 'property damage' only if [t]he . . . 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory. . ..'" (Policy, ¶I, A, 1(b)(1) at 1.) Section V, Provision 12 defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Policy, ¶V, 12 at 13.)

The parties disagree about whether there was an "occurrence" as a prerequisite for coverage under the Policy. However, the parties agree that the defective construction of the anodizing line itself cannot satisfy the "occurrence" requirement. (Def's. Mem. In Supp. Summ. J. at 15-16; Pl.'s Mem. In Supp. Summ. J. at. 6; Def.'s Resp. at 2.) The parties further agree that damage to the property of third parties *can be* considered an "occurrence." (Def's. Mem. In Supp. Summ. J. at 15-16; Pl.'s Mem. In Supp. Summ. J at 6; Def.'s Resp. at 2-3.) The rationale for the distinction between the defective anodizing line itself and the possible damage to third-party property is that the defective construction of a product or work is an uninsurable business risk, and not an insurable

---

[5] Under the Policy, the property damage liability limit is $1,000,000. Plasfab also had umbrella coverage with Selective up to $1,000,000.

"accident." However, damage to property of third-parties based on defective work *is* an insurable risk. The Rhode Island Supreme Court describes the distinction as follows:

> The consequence of not performing well is part of every business venture; the replacement or repair of faulty goods and work is a business expense, to be borne by the insured-contractor in order to satisfy customers. The insured risk is that of damage to the property of others caused by faulty workmanship. Unlike business risks of the sort described above, where the tradesman commonly absorbs the cost attendant upon the repair of his faulty work, the accidental injury to property or persons substantially caused by his unworkmanlike performance exposes the contractor to almost limitless liabilities . . .. The theory is that the risk of faulty performance of contractual obligations is so special and peculiar to each contract and contractor as to be uninsurable by risk-spreading across a class of insureds, while the risk of accidental damage to the property of others by negligence is sufficiently random and general as to be insurable by spreading the cost of the risk across a class of insureds.

Aetna Cas. Ins. Co. v. Consulting Envt'l. Eng'rs, Inc., 1989 WL 1110231 at *3 (R.I. Sup.Court 1989) (*internal citations omitted*) (*citing* Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 239 (N.J. 1979)). Thus, the Court next considers whether the complaint alleges any damage to third-party property. Such damage would constitute an "occurrence" as contemplated by the Policy.

**b) Property Damage**

To find potential coverage under the Policy, the Court must find allegations of (a) property damage, and (b) third-party ownership of damaged property. There is no dispute about whether the complaint alleges that some of the pistons constituted third-party property.[6] However, the parties have different views about whether the complaint adequately alleges that those third-party pistons were actually damaged.

---

[6] Plaintiff's complaint in the underlying action against Plasfab states the following relevant allegations regarding third-party ownership of the pistons: "While the line was being developed . . . Race City contacted numerous prospective customers for the piston anodizing service . . . and some of these prospective customers actually sent pistons to Race City to be anodized on a test basis." (Compl. ¶13)

Provision 15 of the Policy's definition section defines "property damage" as follows: "a. Physical injury to tangible property, including all resulting loss of use of that property . . .; or b. Loss of use of tangible property that is not physically injured . . . ." (Policy, ¶V, 15 at 14.) Because the language of the policy is in the disjunctive (as opposed to the conjunctive), Race City does not have to allege facts in support of <u>both</u> physical injury and loss of use in order to bring its claim within the Policy's "property damage" definition.

Defendant argues that neither physical injury nor property damage was expressly alleged in the Complaint. The complaint in the underlying action avers in the Fourth Claim For Relief (alleging Negligence) that "pistons furnished by third parties were anodized and made useless and of no value using the Plasfab line."[7] (Compl. at 3.) The question, then, is whether the fact that these third-party pistons were "anodized and made useless and of no value" alleges property damage to the pistons. In addition to alleging that the pistons were "made useless and of no value" after being anodized, the Complaint alleges the following facts:

- Race City purchased an anodizing line from Plasfab which was supposed to anodize at least one thousand pistons per week. (Compl. ¶¶6, 8)
- During the development and installation process, Race City received pistons from customers to be anodized on a test basis. (Compl. ¶13)
- The anodizing line could not be made to work as promised, and could only produce two pistons that met specifications per anodizing cycle, instead of the promised one thousand per week. (Compl. ¶¶14, 15)

---

[7] Defendant argues that the default judgment was not based upon a negligence theory and that the only allegation that would potentially bring Race City's claims within the Policy is mentioned in what Race City titled its negligence claim. While not particularly well drafted, Race City's First Claim For Relief (alleging Breach of Contract) also sought to recover "compensatory damages in such amounts as its evidence may establish, including . . . all expenses incurred in attempts to make the line work as promised . . ." (Compl. at 3.) Similarly, the Second Claim For Relief (alleging Breach of Express Warranty) sought to recover "all damages which [Race City's] evidence may establish." (Compl. at 3.) In any event, "notice pleading" is generally all that is required under the federal rules.

- Race City employees spent months attempting to make the line work. (Compl. ¶15)

While it is true that Race City's Complaint does not in so many words state that its customers' pistons were physically injured or damaged by the anodizing line, the allegation that pistons were anodized but did not meet specifications leads to the inference that they were necessarily or at least probably "damaged." The process of anodization itself is an electrolytic process which changes the surface of the pistons to create a thicker oxide layer.[8] The thickness of that layer allegedly did not meet the specifications agreed upon by the parties. Thus, as the anodizing line chemically altered the pistons in a way that did not meet specifications, those pistons were physically damaged. Therefore, the pistons furnished by third-parties were physically injured, and come within the Policy's definition of "property damage."

As they could not be used for their specified purpose, there was also a "loss of use." This loss of use is expressly alleged in the Complaint. The Defendant's argument that anodization of the pistons was a desired result, and that the process actually improved the pistons is unconvincing in light of the fact that the parties in the underlying action had allegedly agreed upon the precise specifications which the anodized pistons were to meet. In addition, Race City expressly alleged that the anodized pistons were of "no value."

Finally, the cases cited by Defendant Selective on this issue are readily distinguishable. *See* Hobson Constr. Co., Inc. v. Great Am. Ins. Co., 71 N.C.App. 586 (N.C.App. 1984); and Harbor East-Office v. Travelers Cas. & Sur. Co., 201 F.3d 436 (4th Cir. 1999) (*unpublished*). In Hobson, the damage in question was to the work of the insured itself, a point which is not in dispute here as Race

---

[8] http://en.wikipedia.org/wiki/Anodizing

City agrees that damage to the anodizing line itself would not have been covered by the Policy. In Harbor East-Office, on the other hand, the issue was that a subcontractor had provided too few "helper" piles to bear the weight of construction for the particular soil into which they were placed, and the owner of the property upon which the construction was being conducted contended that these piles were physically injured because they could not support as much weight in this soil as originally contemplated. These piles, however, were in no way *changed* or *physically altered* in a way that would allow a finding of physical injury or damage. As the Harbor East-Office Court succinctly stated:

> This contention is meritless. The piles were not physically injured. Indeed, they still stand underneath the building **with all of the same physical capabilities that they had before they were placed in the soil**. They cannot support as much weight as they would be able to if placed in more favorable soil, but this is not the result of any physical injury. It is, rather, the result of the piles' preexisting capabilities and limitations. The piles have not been physically damaged; they have simply been misused.

Id., at 3 (*emphasis added*). The instant case is distinguishable as there was a chemical alteration of the pistons as a result of the anodizing process.

In conclusion, the Policy's definition of "property damage" includes both physical injury to tangible property as well as loss of use of tangible property that is not physically injured. In this case, there is both, as the physical injury to the pistons gives rise to the loss of use.[9] Because Race City's complaint included allegations that alerted Selective that one or more of the claims asserted might potentially fall within Plasfab's Policy, Selective breached its duty to defend Plasfab in the underlying action.

---

[9] As discussed above, such damage constitutes an "occurrence" as defined within the policy.

### 5.  Consequences Of Selective's Breach Of Its Duty To Defend / Estoppel

Given the Court's finding that Selective breached its duty to defend, the Court next considers whether Selective is entitled to assert its defenses under the Policy.   Race City contends that by refusing to defend Plasfab altogether, Selective effectively waived its right to rely on any exclusions of coverage within the Policy.   Stated differently, Race City contends that because Selective breached its duty to defend against the claims asserted in the underlying action, Selective is now estopped from asserting the policy  as a bar to a judgment requiring Selective to pay Race City the full amount of the default judgment.[10]

According to Race City, instead of choosing not to participate in the underlying action in any manner, Selective could have 1) elected to defend under a "reservation of rights" pursuant to the terms of the Policy; 2) elected to defend pursuant to a non-waiver agreement; or 3) sought a declaratory judgment seeking a judicial determination of its obligations under the Policy.   If Selective had followed any one of these alternative courses of action, Selective could have maintained that its coverage, if any, was limited consistent with the terms of the Policy.   Because Selective did not so elect, we turn now to the consequences of its decision.

Both Rhode Island and North Carolina law hold that when an insurer breaches its duty to defend, it waives its right to rely on any coverage defense and is then liable for the full amount of any judgment or settlement against its insured in the action it refused to defend.  *See* St. Paul Fire, 919 F.2d 235, 240 (4th Cir. 1990) (*citing* Ames v. Continental Cas. Co., 340 S.E.2d 479, 79 N.C.App.

---

[10] Selective contends that Race City, as a third-party uninsured (not named as an "insured" in the insurance contract), cannot assert estoppel against Selective.  This issue is addressed further below.

530 (1986)); <u>Conanicut Marine Servs. v. Ins. Co. Of North Am.</u>, 511 A.2d 967, 971 (R.I. 1986) ("We hold that where an insurer refuses to defend an insured pursuant to a general-liability policy, the insurer will be obligated to pay, in addition to the costs of defense and attorneys' fees, the award of damages or settlement assessed against the insured.") This is true even where the insurer "acts in good faith and has reasonable ground to believe there is no coverage under the policy." 46 C.J.S. Insurance §1154 (2007). The rationale of courts adopting this rule is that once the insurer breaches the insurance contract by failing to comply with those portions of the policy that benefit its insured, the insurer may not then rely upon the clauses that favor the insurer. <u>Id.</u>

Addressing the consequences of an insurer's breach of its duty to defend in a similar context, the North Carolina Court of Appeals explained:

> With regard to claims against an insured in which a default judgment is obtained in favor of the claimant,
>
> if an insurer had a right to defend the injury action against the insured, had timely notice of such action, and defends or elects not to defend, the judgment, in the absence of fraud or collusion, is binding upon the insurer as to issues which were or might have been litigated therein.

<u>Naddeo v. Allstate Ins. Co.</u>, 533 S.E.2d 501, 506, 139 N.C. App. 311 (2000) (breach of duty to defend obligated insurer to pay the full amount of default judgment entered by the court against its insured in the underlying action) (*citing* Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 106:50 (1997) and <u>Strickland v. Hughes</u>, 160 S.E.2d 313, 273 N.C. 481 (1968)).

Selective's duty to defend has already been established. In addition, there is no question regarding the timing or sufficiency of Selective's notice of the underlying action. Finally, there is no evidence of fraud or collusion. Accordingly, Selective is deemed bound as to any issue which might have been litigated in the underlying action (i.e., coverage defenses) had Selective originally

chosen to defend.

Furthermore, both North Carolina and Rhode Island state courts expressly reject the argument advanced here by Selective, namely, that even if a breach of its duty to defend is found, the breach does not create liability beyond the scope of the contract, or create more coverage than the insured paid for.[11]  St. Paul Fire, 919 F.2d at 241 n.5 (noting merit of insurer's argument but holding that the argument is foreclosed by governing precedent); Conanicut Marine Servs., 511 A.2d at 969 n.2, 970-71.  In Conanicut Marine Services, the Rhode Island Supreme Court stated that,

> "An insurer who denies coverage does so at its own risk, and, although its position may not have been entirely groundless, **if the denial is found to be wrongful it is liable for the full amount** which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract."

Conanicut Marine Servs., 511 A.2d at 971 (*emphasis added*) (*quoting* Comunale v. Traders & Gen. Ins. Co., 50 Cal.2d 654, 659, 328 P.2d 198, 201 (1958)).   Since Selective breached its duty to defend, Selective's denial is deemed wrongful.  Selective may be held responsible for the full amount of the default judgment.

In an attempt to avoid this admittedly harsh result, Selective tries to distinguish this case from Conanicut Marine Services by contending that because Plasfab did not itself defend the underlying action, or incur any costs resulting from the default judgment given the bankruptcy proceedings, there is no detrimental reliance triggering an estoppel defense.  The Court disagrees.  Once Selective

---

[11] Selective questions whether Rhode Island law comports with North Carolina law on this issue. In support, Selective refers the Court to two (2) Rhode Island cases analyzing very different facts - where the insurer was not found to be in breach of its duty to defend.  *See* D'Antuono v. Narragansett Bay Ins. Co., 721 A.2d 834, 837 (1998); Martinelli v. Travelers Ins. Co., 687 A.2d 443, 447 (1996).  However, since neither of these cases involved application of estoppel as a consequence of an insurer's breach of its duty to defend, neither controls.

notified Plasfab that it would not defend against Race City's suit, Plasfab's inability to defend the action itself amounts to detrimental reliance.  Presumably, if Plasfab had the benefit of Selective's defense, Plasfab would have been able to flesh out the coverage defenses now advanced by Selective, and may have been able to limit Race City's recovery to a  monetary award based solely upon actual physical damage to the pistons belonging to third- parties.  Selective's arguments regarding estoppel are not persuasive.

## 6) Race City's Ability To Bring This Action / Assert Estoppel

Plaintiff Race City contends that for purposes of this action, Race City "stands in the shoes" of Plasfab.  According to Plaintiff, it has three (3) independent grounds for asserting its claims and the estoppel defense: the Policy language, Plasfab's assignment, and Plaintiff's status as an intended third-party beneficiary.  Despite the rules of law discussed, *supra*, explaining the consequences of an insurer's breach of its duty to defend, Selective claims that Race City may not recover under the Policy except to the extent that its damages are based upon covered claims.[12]  Selective cites no legal authority for the proposition that defensive estoppel may only be asserted by an actual party to the insurance contract.

### a) Policy Language

In making their respective arguments, the parties refer to the Policy itself.  Within "Section IV - Commercial General Liability Conditions," in a clause entitled, "Legal Action Against Us," Selective attempts to limit recovery by any non-insured as follows:

---

[12]  As Plaintiff points out, by challenging Race City's ability to stand in the shoes of Plasfab for purposes of estoppel, Selective complains that it would be unfair to hold it responsible for the entire judgment if only a small portion would have been covered under the Policy.

A person or organization may sue to recover on . . . a final judgment against an insured obtained after an actual trial; but we will not be liable to damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. . .

(Policy, ¶IV, 3 at 10.)  Race City contends that the existence of this provision reveals that the Policy envisions and allows actions against the insurer by a non-insured third party.[13]  In its effort to limit Plaintiff's recovery, Selective relies on the language in the provision that  "we will not be liable to damages that are not payable under the terms of this Coverage Part."  However, this language is not determinative of the issue because if Race City can raise the defense of estoppel, Selective may not rely on this provision within the Policy to limit Race City's recovery.

**b) Validity Of Plasfab's Assignment Of Rights To Race City / Selective's Related Motion To File Supplemental Brief & Affidavit**

On December 21, 2005, after the close of discovery, Race City supplemented its Rule 26 Disclosures by serving Selective with a document purporting to be an assignment of rights from Plasfab to Race City.  (Pl.'s Exh. D)  The document, entitled "Assignment," was executed on December 19, 2005, by the bankruptcy trustee (on behalf of Plasfab) and Plaintiff's counsel.[14]

The Assignment reads in part:

"Plasfab, by Marc D. Wallick, Bankruptcy Trustee for Plasfab, hereby assigns and transfers **any and all of such rights, title and interest in Selective Policy Number S1691581 as may exist** to Race City, subject to approval by the Bankruptcy Court, which approval will be sought in the event of any recovery by Race City from

---

[13]  Race City does not address the significance of the language "final judgment against an insured obtained after an actual trial."

[14]  The assignment did not exist until after the close of discovery.

Selective. . . "[15]

(Pl.'s Exh. D) (*emphasis added*).  Thus, the bankruptcy trustee assigned all of Plasfab's rights under the Policy to Race City, subject to approval by the bankruptcy court in the event of recovery.

While the Policy does not prohibit assignment altogether, there is a clause within the "Common Policy Conditions" that prohibits an assignment of rights without first obtaining written consent from Selective.  The relevant provision is entitled "Transfer Of Your Rights And Duties Under This Policy," and provides in part:

> "Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured. . ."

(Common Policy Conditions, ¶F)[16]   According to Selective, it never gave Plasfab (or the bankruptcy trustee) written consent to assign its rights under the policy.[17]  (Bryant Aff., ¶3)  As a result, Selective

---

[15]  As a condition to the assignment of rights, the agreement requires Race City to share in any recovery with both the Trustee and the bankruptcy estate.  Race City waived the right to file any claim against the assets of the bankruptcy estate but specifically reserved any and all rights to seek recovery from Plasfab, Inc.  The fact that Race City reserved the right to seek recovery from Plasfab distinguishes this case from the facts of Lida Manuf. v. U.S.F. & G.  *See* Lida Manuf. v. U.S.F. & G., 448 S.E.2d 854, 116 N.C.App. 592 (1994) (settlement agreement containing promise not to execute confessed judgment against insured relieved insurer of its legal obligation to pay).

[16] Race City apparently agrees that the "Common Policy Conditions" is also a part of the policy that it seeks to enforce against Selective.

[17]  On February 16, 2007, more than a year later, Selective requested leave of the Court pursuant to FED. R. CIV. P. 6(b) to file a supplemental brief and affidavit regarding the validity and effect of the bankruptcy trustee's assignment of Plasfab's claims against Selective to Race City.  The bases for Selective's motion are counsel's "mistake" and "excusable neglect."  According to Selective, after learning of the purported assignment, its counsel "inadvertently failed to study the Common Conditions of the policy."  (Def.'s 2-16-07 Mem. In Supp. at 3.)  Race City opposes Selective's motion and contends that counsel's conduct, namely, inadvertence, does not amount to excusable neglect for purposes of Rule 6(e). Consistent with the federal policy in favor of resolving cases on the merits, the undersigned, in its discretion, finds that excusable neglect exists.  Consequently, the Court considers the February 16, 2007 Affidavit of Deborah Bryant, Selective's Claims Adjustor responsible for the denial of coverage decision that gave rise to this action.  (Def.'s Exh. F to 2-16-07 Motion)   Because the parties' filings related to

contends that Plasfab's failure to obtain written consent renders the assignment void.

According to Selective, the validity of the assignment only bears on Race City's ability to assert estoppel.[18]   Applying the estoppel rule approved of in <u>Naddeo</u>, Selective is only precluded from asserting those defenses that it could have litigated had it originally defended the underlying action.  <u>Naddeo</u>, 533 S.E.2d at 506.   Here, the assignment was not executed until <u>after</u> the judgment was entered against Plasfab.   Therefore, Selective could not have asserted the conditions upon assignment identified within the Policy during the underlying action.   Under <u>Naddeo</u>, Selective has not yet waived its right to challenge a post-judgment assignment.   Plasfab's assignment of rights does not comply with the plain language of the Policy, namely, the requirement that Plasfab obtain written consent prior to assignment.[19]   For this reason, the assignment does not necessarily provide Race City with a basis for asserting estoppel against Selective.[20]

---

Selective's motion adequately addressed the assignment issue, no additional briefing is necessary.

[18] Selective contradicts itself on this issue.  First, Selective states that absent a valid assignment to create privity of contract between Race City and Plasfab, Race City cannot assert a claim alleging estoppel.  (Def.'s Mem. In Supp. Summ. J. at 30.)  In the same filing, Selective also claims that "even a valid assignment of the rights of Plasfab would not alter the result here."  (<u>Id.</u> at 31.)  Selective argues that, even with a valid assignment creating privity, because Plasfab is not the party suing, an estoppel claim fails.

[19] At least one treatise suggests that a post-loss assignment is valid even if it is made without the insurer's consent where consent is required under the terms of the policy.  *See* Allan D. Windt, INSURANCE CLAIMS AND DISPUTES, Representation of Insurance Companies and Insureds, 4ᵗʰ Ed., §9:15 (2007) (*internal citations omitted*).

[20] Selective concedes that the assignment of rights issue does <u>not</u> impact Race City's claim for damages for claims covered by the terms of the Policy. (Def.'s 3-12-07 Reply at 3.)  Absent the ability to raise estoppel, Race City is still entitled to recover for the actual physical damages to the pistons belonging to Plasfab's third-party customers.  While the Court's analysis focuses on the duty to defend, and Selective's breach of that duty, the same result (i.e., a partial recovery consistent with Selective's concession) may be reached by invoking Selective's duty to indemnify, to pay the judgment imposed against its insured.

### c) Intended Third-Party Beneficiary Rule

As an alternative to relying on the Policy language or the assignment of rights, Race City argues that once it obtained the default judgment against Plasfab, it became an intended third-party beneficiary under the Policy. Selective dedicates little time to this argument in its memoranda. Again, without citing any legal authority, Selective states that estoppel is not an available remedy to a third-party beneficiary. According to Selective, adopting Race City's argument would require the Court to enforce certain portions of the Policy and ignore others.

Under North Carolina law, where "the liability of the insured has been established by judgment, the injured person may maintain an action [as a third-party beneficiary] on the [insured's] policy of [liability] insurance." *See* Lavender v. State Farm Mut. Auto. Ins. Co., 450 S.E.2d 34, 35, 117 N.C. App. 135 (1994) (*quoting* Hall v. Harleysville Mut. Casualty Co., 64 S.E.2d 160, 161, 233 N.C. 339 (1951)). Applying the third-party beneficiary doctrine, once Race City obtained the default judgment against Plasfab, Race City is deemed to be in privity with Selective. Murray v. Nationwide Mut. Ins. Co., 472 S.E.2d 358, 366, 123 N.C. App. 1 (1996) (third-party beneficiary is considered to be in contractual privity with insurer). On this theory, it appears that after judgment is entered, Race City possesses the very same rights under the Policy as Plasfab even though these rights arise out of the insurance contract itself. Consequently, the Court finds that Race City may assert the estoppel defense against Selective.

Race City's recovery is subject only to the Policy limits.[21]

---

[21] According to Plaintiff, the default judgment award of $714,414.96, including interest and costs, is within the Policy's property damage liability limit.

**7) Defendant's Motion to Strike Plaintiff's Reply**

Defendant Selective moves to strike Race City's reply brief (and attached exhibit) based upon the argument that Race City attempts to assert a new claim not raised within the Complaint. Selective contends that the "purported transcript" of the default judgment hearing in the underlying action should not be considered because to do so would constitute a violation of Rules 56, 16(b), and 26(a)(1) of the Federal Rules of Civil Procedure. Selective challenges the authenticity of the transcript and asserts it contains "inadmissible hearsay." Notwithstanding Selective's position, even if Race City had <u>not</u> referenced the evidence presented during the damages hearing on August 19, 2003, and had <u>not</u> produced a copy of the transcript of those proceedings (official or unofficial), the Court, of its own accord, would have taken judicial notice of the facts established in the underlying action.[22]

### III. CONCLUSION

**IT IS THEREFORE ORDERED THAT:**

1) Defendant's Motion for Summary Judgment is hereby **DENIED**;

2) Plaintiff's Motion for Summary Judgment is **GRANTED;**

3) Defendant's Motion to Strike Plaintiff's Reply is **DENIED**, consistent with the terms of this Memorandum and Order; and

4) Defendant's Motion To Allow Filing Of Supplemental Brief and Affidavit is **GRANTED in part** and **DENIED in part**.

---

[22] The undersigned would have taken judicial notice of these facts even if Plaintiff had not attached the hearing transcript to its reply brief.

Signed: May 3, 2007

Richard L. Voorhees
United States District Judge